UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

ALAN L. HICKS,

   Plaintiff,

v.          Civil Action No. 2:22-cv-00281

SANDRA MAY, Physician's
Assistant, PAMELA GIVENS,
Hospital Administrator,
WEXFORD HEALTH SERVICES,
INC., DONNIE AMES,
Superintendent, Mount Olive,
Correctional Complex,

   Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

   Pending is Magistrate Judge Tinsley's Proposed
Findings and Recommendation ("PF&R") (ECF No. 58), filed on June
17, 2025, and plaintiff Alan Hicks's objections thereto (ECF No.
63), filed on July 11, 2025, relating to the following:
plaintiff's <u>pro</u> <u>se</u> proposed amended complaint (ECF No. 47)
(which superseded his prior proposed Motion to Amend Complaint
(ECF No. 41)) and construed by the magistrate judge as a motion
for leave to amend, filed on May 3, 2024; responses thereto by
defendants Sandra May, Pamela Givens, and Wexford Health
Sources, Inc. (the "Wexford defendants")(ECF No. 51) and

defendant Donnie Ames (ECF No. 52), both filed on August 20, 2024; and plaintiff's reply to defendants' responses (ECF. No. 57), filed on September 19, 2024.

### I.    Procedural History

As more fully set forth below, on January 5, 2024, Magistrate Judge Tinsley recommended that the undersigned judge (1) grant the Wexford defendants' Motion to Dismiss plaintiff's original complaint (ECF No. 15) with respect to all claims against the Wexford defendants, except for the claim of retaliation in violation of the First Amendment lodged against defendant May, and (2) grant defendant Ames' Motion to Dismiss plaintiff's original complaint (ECF No. 20) in its entirety. ECF No. 37 at 22.  On March 29, 2024, the undersigned judge largely adopted that recommendation but modified it to the extent that defendants' respective motions to dismiss were granted as to all claims against all defendants -- over plaintiff's objections thereto.  See ECF No. 46.  However, in light of plaintiff's first proposed Motion to Amend Complaint (ECF No. 41), which was filed contemporaneously with his PF&R objections, the undersigned judge left that matter referred to Magistrate Judge Tinsley for consideration thereof.  Id. at 30-31.

Thereafter, plaintiff filed his proposed amended complaint (ECF No. 47) further seeking to remedy the deficiencies of his original complaint by reiterating allegations from his previously filed Motion to Amend Complaint (ECF No. 41) -- allegations occurring after the filing of the original complaint.  Magistrate Judge Tinsley aptly ordered (1) that plaintiff's proposed amended complaint (ECF No. 47), be treated as plaintiff's "most recent iteration of his claims and additional facts supporting them," and be construed as a motion for leave to amend and (2) set a briefing schedule with respect thereto.  ECF No. 50 at 3.

a.

Liberally construed, as precedentially required, plaintiff's original pro se complaint (ECF No. 1) alleged 42 U.S.C. § 1983 claims against all defendants for deliberate indifference to his serious medical needs in violation of the Eighth Amendment of the United States Constitution, and as to defendant May, a § 1983 claim for retaliation in violation of the First Amendment.  See Order, ECF No. 46.

At all times relevant to the factual allegations in the complaint and proposed pro se amended complaint, defendant Wexford Health Services, Inc. ("Wexford") contracted with the West Virginia Division of Corrections and Rehabilitation

3

("WVDCR") to provide medical services to state facilities, including Mount Olive Correctional Complex ("MOCC"), in which plaintiff was housed; defendant May ("May") was employed by Wexford as a physician's assistant at MOCC; defendant Givens ("Givens") was employed as Wexford's medical administrator; and defendant Ames ("Ames") was employed by the WVDCR as MOCC's superintendent.

At bottom, the original complaint stemmed from May's alleged, repeated denials of plaintiff's requests to keep prescribed medications on his person, a designation which is colloquially referred to by plaintiff as "KOP." See Order, ECF No. 46. The frequency of the denials, their timeframe, and as to which medication(s) they pertain were muddled at best, and at worst, contradictory. See ECF No. 1; id. Notwithstanding the confounding nature of the allegations, the court construed them in the light most favorable to plaintiff, as was required. See id. Specifically, the undersigned judge discerned the following factual allegations as set forth in the court's March 29, 2024, order.

During a routine health check in February of 2022, plaintiff was prescribed 50 mg of beta-blocker Atenolol by Dr. Charles Lye, who is not a defendant in this case, after conveying to Dr. Lye that he had fluid build-up in his legs and

4

trouble breathing.  Id. at 2.  During the health check, Dr. Lye
opined that plaintiff's symptoms were indicative of congestive
heart failure and that plaintiff had formerly been prescribed
conflicting blood pressure medications.  Id.  Plaintiff, by his
own measure, believed the 50 mg of Atenolol drove his blood
pressure too low.  Id.

Plaintiff was subsequently seen by May in early April
of 2022, where he informed her of his breathing issues and
perceived low blood pressure while taking Dr. Lye's
prescription.  Id.  In response, May replaced plaintiff's blood
pressure prescription with 25 mg of Metoprolol, twice a day,
telling plaintiff she would monitor whether the change in
medication helped his breathing issues.  Id.  May required
plaintiff to pick up his new prescription from the pill line for
one month before he was permitted to have the prescription KOP.
Id. at 2–3.  She subsequently ordered for plaintiff a chest x-
ray, breathing tests, and two EKGs.  Id. at 3.

Results of the various tests led May to conclude
plaintiff's lungs "looked excellent," a characterization that
"raised red flags with the [p]laintiff" because he "smoked two
packs of non-filtered cigarettes a day for 45 years and was
diagnosed with COPD 30 years ago."  ECF No. 1 at 3 n.1; see id.
However, one of the EKGs revealed a heart murmur or arrhythmia,

5

for which May prescribed a blood thinner.  Id.  After one month,
plaintiff ceased taking the blood thinner, despite May's alleged
warning that he "could die of blood clots without it," because
he claimed it caused him painful skin eruptions resembling
burns.  Id.

Nevertheless, plaintiff alleged that May did nothing
to specifically treat his breathing problems.  Id.  He
"submitted a sick call" in which he requested to speak with
Givens about seeing a different medical provider or receiving an
outside treatment referral.  Id.  In a subsequent meeting,
Givens refused plaintiff's request.  Id.  Plaintiff responded
that he would refuse further treatment and bring legal action.
Id.  Plaintiff "noticed" May "standing outside the door[,]"
presumably spectating the meeting.  Id. at 4.

The day after the meeting between plaintiff and
Givens, May allegedly required that plaintiff pick up his "blood
pressure medications" at the pill line, as opposed to
designating the medication KOP.  Id.  Shortly thereafter,
"[p]laintiff was given a pass for blood work . . . suspect[ing]
[May] was making another attempt to harass."  Id.  He was told
that "May had ordered the blood work."  Id.

On May 9, 2022, plaintiff filed a "WVDCR Inmate
Grievance Form," in which he stated the following as the nature

6

of his grievance: "Refer me to a [d]octor for health ca[re] and prevent Sandra May from harassing me, by taking aw[ay] my KOP[s]. Have my breathing problem addressed." ECF No. 1-1, at 1; id. at 4-5.

Plaintiff's original complaint acknowledged that May also prescribed him an inhaler to be used at the pill line, and further noted that May told plaintiff she required his medication to be used at the pill line to ensure he was taking it properly. Id. at 5. Nonetheless, plaintiff contended that the pill line designation of his medication was retaliatory, and he refused to attend the pill line. Id.

The original complaint alleged further facts, though their sequence and import were decidedly undiscernible. Id. These facts included:

> [O]n "May 17, 2022, when [p]laintiff's other KOP's [sic] were renewed, the blood pressure medications were also returned to KOP status." Plaintiff suspected "May was trying to trap him somehow," but "[a]fter approximately ten days without blood pressure medications," plaintiff was "assured that his blood pressure medication was changed to [KOP]." Plaintiff then alleges that "[w]hen those medications were due to be renewed," he was told "only [May] could renew those." Though it is unclear whether May ever actually refused to renew his "blood pressure medications . . . ."

Id. (quoting ECF No. 1).

No specific facts regarding Ames were alleged, though the simple fact that Ames became aware of plaintiff's medical complaints after his denial of plaintiff's grievance was fairly inferred.  Id.

All defendants moved to dismiss the original complaint, asserting that plaintiff's original complaint failed to state a § 1983 claim for deliberate indifference in violation of the Eighth Amendment against any respective defendant.  See ECF Nos. 15, 16, 20, and 21.

b.

Based on the above factual allegations present in the original complaint, Magistrate Judge Tinsley, in his January 5, 2024, PF&R, recommended that the undersigned judge grant defendants' respective motions to dismiss in regard to plaintiff's Eighth Amendment claims but deny them in regard to an identified § 1983 claim by plaintiff for retaliation against May in violation of the First Amendment.  See ECF No. 37 at 22; see also Order, ECF No. 46 at 7–8.

The undersigned judge agreed, over plaintiff's objections thereto, with respect to plaintiff's Eighth Amendment claims against defendants.  See id.  Specifically, the court concluded: (1) "Plaintiff's [original] complaint, even construed liberally, did not allege that Wexford had a policy or custom

8

that gave rise to the injury complained of, nor did it allege facts that could give rise to an inference of such a policy," id. at 18; (2) The original complaint was insufficient in establishing that Ames had or should have had actual knowledge of a serious medical condition of plaintiff which necessitated treatment, id. at 20; (3) The facts alleged in the original complaint indicated that "May sought a course of treatment to address [plaintiff's] medical issues that she believed was adequate," id. at 22; and (4) The original complaint was insufficient in establishing that Givens subjectively knew of an objectively serious risk of harm, id. at 24.

With respect to the identified § 1983 claim for retaliation by May in violation of the First Amendment, the undersigned judge disagreed with Magistrate Judge Tinsley's finding inasmuch as plaintiff failed "to plead a causal relationship between his grievance and any allegedly retaliatory action by May." Id. at 30. Thus, the undersigned judge dismissed the original complaint in its entirety. Id.

c.

Thereafter, on May 3, 2024, plaintiff filed his proposed amended complaint (ECF No. 47) which was duly construed by Magistrate Judge Tinsley as a motion for leave to amend. ECF No. 50 at 3. The Wexford defendants filed their collective

9

response (ECF No. 51) and defendant Ames filed his response (ECF No. 52) on August 20, 2024.  Plaintiff filed his reply (ECF No. 57) on September 19, 2024.

The Wexford defendants argue that plaintiff "asserts no additional allegations that more clearly define or support his allegations[,]" and as such, his proposed amended complaint, construed as a motion for leave to amend, should be denied as futile.  See ECF No. 51.  Ames also argues that plaintiff's proposed amended complaint "should be denied for futility" as the amended allegations do not sufficiently satisfy the elements of a claim for supervisor liability under § 1983.  See ECF No. 52.

On June 17, 2025, Magistrate Judge Tinsley issued his PF&R recommending -- in a familiar fashion -- that the undersigned judge dismiss plaintiff's proposed amended complaint with respect to all claims against all defendants, except to the extent that a First Amendment retaliation claim against May is alleged.  ECF No. 58 at 28.  Magistrate Judge Tinsley recommends leaving "this matter referred . . . for further proceedings concerning that singular claim."  Id.  Plaintiff filed his objections thereto (ECF No. 63) on July 11, 2025.

II.  <u>Factual Allegations in the Amended Complaint</u>

At the outset, the court notes that plaintiff's amended complaint is in large part a regurgitation of his original complaint, and as such, the muddled nature of the original complaint is ever-present.  The court articulates the following rendition of the alleged factual circumstances in plaintiff's amended complaint with the precedential leniency afforded to <u>pro</u> <u>se</u> pleadings in mind.

In late 2021, plaintiff began to experience sleepless nights as a result of a newfound trouble breathing.  Am. Compl., ECF No. 47 at 2.  Plaintiff "submitted a sick call request and was seen by [d]efendant May."  <u>Id.</u>  At this time, plaintiff physically possessed various medications with KOP designations, including Aspirin, Tylenol, Naproxen, and two blood pressure medications, "20 milligrams Lisinopril[] and [] a combination medication of 20 milligrams of Lisinopril and 25 milligrams of HCTZ."  <u>Id.</u>  May, during plaintiff's visit with her pursuant to his sick call request, prescribed plaintiff a beta blocker with a KOP designation to be taken "in conjunction with his other blood pressure medications."  <u>Id.</u>  The beta blocker did not provide plaintiff any relief.  <u>Id.</u>

It was in February 2022, that plaintiff had the routine checkup with Dr. Lye, who is not named as a party in the

11

complaint.  Id.  Plaintiff complained of fluid buildup and
breathing issues during the checkup.  Id.  Dr. Lye informed
plaintiff, after checking plaintiff's chart, that his blood
pressure medications were conflicting.  Id.  Dr. Lye opined that
plaintiff's breathing problem may have been indicative of
congestive heart failure.  Id.  Dr. Lye changed plaintiff's beta
blocker prescription, "since the fluid could have been caused by
[it]", to "50 milligram Atenolol."  Id.  Dr. Lye would "wait to
see if [the new medication] helped the breathing problem."  Id.
As earlier noted, by plaintiff's own measure, the new medication
"drove [his] blood pressure [too] low."  Id.  Plaintiff "put in
a sick call request" to that effect.  Id.

        Plaintiff's sick call request pended without action
while plaintiff's unit was "placed on Covid quarantine."  Id.
In April 2022, plaintiff was seen by May in response to his sick
call request.  Id.  Plaintiff explained that the new medication
prescribed by Dr. Lye dropped his blood pressure too low.  Id.
May discontinued the new medication, prescribing instead "25
milligrams of Metoprolol twice daily."  Id.  May "required
[plaintiff] to pick it up at the [morning] pill window for a
month before allowing it KOP."  Id.  When plaintiff requested
that he be allowed to take the Metoprolol at the afternoon and
nightly pill lines because of his trouble sleeping, May refused,
"opin[ing] that [plaintiff] would need to choose between his

need for medication and his need for sleep." Id. Also, May
"stated that she wanted to wait to see if the change in
medication helped with the breathing[] before going forward with
treating the breathing problem." Id. at 3.

"[M]any weeks after [plaintiff] first [sought]
treatment for the breathing problem," May ordered multiple tests
for plaintiff, which included an X-ray, "breathing tests," and
two EKGs. Id. May conveyed that plaintiff had tested well on
the breathing tests, but plaintiff did not trust May's
conveyance, as he was diagnosed with chronic obstructive
pulmonary disease prior to his 1987 incarceration. Id. The
first EKG was inconclusive. Id. The second EKG revealed an
arrhythmia or heart murmur, for which plaintiff was prescribed a
blood thinner to take at the evening pill line. Id. Also at
this time, "May failed to inform [plaintiff] that he had an
enlarged heart." Id.

Plaintiff took the newly prescribed blood thinner for
one month, but by plaintiff's own measure, the medication was
responsible for "painful skin eruptions that resembled burns,"
so he "signed an AMA to discontinue it." Id. When plaintiff
explained the skin eruptions to May and the blood thinner as the
cause, "May kept repeating that [p]laintiff would die from blood
clots[] without it." Id. Plaintiff requested an alternative

13

blood thinner, but May declined.  Id.  Plaintiff represented that the blood thinner did not relieve his trouble breathing, and May "replied that no one would proscribe [sic] blood thinner for a breathing problem."  Id.

After the appointment with May, plaintiff submitted a sick call requesting a meeting with Givens which was granted. Id.  Plaintiff asked Givens for "a different provider or a referral for outside treatment."  Id.  Givens declined plaintiff's requests, stating that May would continue plaintiff's treatment.  Id. at 4.  "Plaintiff explained that he would refuse such treatment and exercise a course of legal action[] based upon the fact that her company was under contract to provide a [d]octor[] but did not have one."  Id.  Knowing that May was listening to the meeting just outside the door, plaintiff asked Givens to close the door.  Id.  Givens instead ended the meeting.  Id.  The amended complaint represents that after this meeting is when plaintiff "started his legal action." Id.  The court notes that plaintiff filed his original complaint on July 11, 2022.

"A few days prior to [plaintiff's] May 9, 2022, grievance[,]" May changed the designation of plaintiff's blood pressure medication to pill line.  Id.  On May 9, 2022, plaintiff filed a "WVDCR Inmate Grievance Form," in which he

stated the following as the nature of his grievance: "Refer me to a [d]octor for health ca[re] and prevent Sandra May from harassing me, by taking aw[ay] my KOP[s].  Have my breathing problem addressed."  ECF No. 1-1, at 1; id.

The day after plaintiff filed his grievance, May called him to the medical unit to ask that he continue the blood thinner which had allegedly caused him skin eruptions.  Id.  May again refused to prescribe plaintiff a different blood thinner. Id.  The amended complaint next asserts:

> The next day [d]efendant May called [plaintiff's] Housing Unit and had case manager Josh Jones the [sic] write down the KOP medications that she wanted [plaintiff] to return to her at the medical unit.  Her request never included [plaintiff's] Aspirin, Tylenol, or the Naproxen which were also KOP[s].

Id.

At 2:00 p.m. on an afternoon soon after, "the medical unit" asked plaintiff to participate in "labs."  Id. at 5. Plaintiff "believed that the request for labs was an act of retaliation by [d]efendant May[] because labs are normally morning fasting labs."  Id.  Plaintiff was escorted to the medical unit to decline having his blood drawn, and the nurse on duty indicated that May had ordered the labs.  Id.

On May 17, 2022, plaintiff's prescriptions for Tylenol, Aspirin, and Naproxen having been renewed, plaintiff

"pick[ed] them up" in light of their KOP designations to find
that his blood pressure medications were also included as KOPs.
Id.  Despite his concern that "May had changed those [blood
pressure medications] to pill line[,]" the nurse on duty assured
plaintiff "that his blood pressure medications were again
changed to KOP[s]."  Id.  The amended complaint then states:
"[W]hen those cards expired, [plaintiff] was told that only
[d]efendant May could renew them . . . forc[ing] [plaintiff],
yet again, to go without his blood pressure medications . . . ."
Id.  Notably, it is not alleged that plaintiff attempted to
renew the medications or that May refused to renew the
medications.  The fairest implication of the allegation as it is
set forth is that, at this point: May may have required
plaintiff to take some combination of his medications at the
pill line had he sought renewal.  Id.

        The above factual circumstances are alleged as
occurring before plaintiff filed his original complaint in this
case on July 11, 2022.  The following factual circumstances are
alleged as occurring after plaintiff filed his original
complaint.

        On August 8, 2022, at approximately 4:00 a.m.,
plaintiff suffered a heart attack caused by congestive heart
failure.  Id.  In the midst of his medical event, plaintiff was

taken to the medical unit, where he was "placed on a gurney by EMT[s] for transportation." Id. Plaintiff was "held in medical for a considerable amount of time[] after being told that [May] was coming to administer an EKG." Id. After a shift change, the new officers present "refused to wait on May" and transported plaintiff to the hospital. Id. The amended complaint next states:

> An agent of some [d]efendant had to have called [May].
> Regardless of which [d]efendant's agent made that
> call, the Superintendent's officer[s] joined in
> [May's] retaliation[] by holding [plaintiff] while he
> was suffering a heart attack. Defendant Ames should
> be held directly responsible for the extreme pain and
> suffering experienced as the result of that act.

Id.

Plaintiff's pancreas was damaged as a result of the heart attack, so he was given several insulin injections while still hospitalized at Charleston Area Medical Center. Id. at 5. When plaintiff returned to MOCC on August 11, 2022, he was informed that his blood sugar would be monitored for two weeks before it was decided whether he would be prescribed diabetic medication. Id. Plaintiff was eventually prescribed three different diabetic medications which were all to be taken twice per day. Id. It is unclear whether these medications were designated KOP. Id.

17

Plaintiff was allowed to continue Lasix, a medication for congestive heart failure which he took intravenously while hospitalized, at MOCC in the form of two heavy oral doses.  Id. He also retained a defibrillator harness from his hospitalization, which facilitated his housing in the MOCC medical unit and prevented him from returning to his MOCC housing pod.  Id.  Plaintiff was denied access to his word processor while in the medical unit.  Id.  "[T]he nurses had open conversations as to what [the nonaccess] would do to [plaintiff's] civil suit."  Id.  In the medical unit, plaintiff received follow-up care from the cardiologist who treated his heart attack.  Id.

On September 3, 2022, before returning to his housing unit, plaintiff requested an allowance to take his prescribed medications at 12:00 p.m. and 9:00 p.m. so he could get further sleep.  Id.  The attending physician's assistant, Josh Shrewsberry, who is not named as a defendant in this case, did not grant plaintiff that allowance.  Id.  Thus, plaintiff "was unable to sleep again because he had to go to the 6:00 [a.m.] pill line[] to get heart medications . . . ."  Id.

During a subsequent chronic care visit, while May trained a "new Wexford [doctor]," plaintiff again asked to take his prescribed medications at 12:00 p.m. and 9:00 p.m.  Id.  May

declined, but the new doctor agreed that changing the time at which plaintiff took his medications could help alleviate his sleeping issues.  Id.

Plaintiff was weaned off his diabetic medications after multiple weekly "diabetic check[s]."  Id. at 6–7.  For three consecutive weeks, the respective check results "came up below 95."  Id. at 7.  Since then, "the entire Wexford staff" refuses to give plaintiff a weekly diabetic check.  Id. Plaintiff's Lasix dose was lowered to 20 milligrams twice a day before the drug was changed to PRN (meaning pro re nata or as needed).  Id.  Plaintiff is now "denied" Lasix because "all PRN medications are KOP"; he further attributes that denial to May "refusing [plaintiff's] Lasix medication that is proscribed [sic] PRN by a cardiologist."  Id.

Plaintiff's cardiologist placed an order for a diabetic check, which has apparently been pending "[f]or at least the last six months," though the amended complaint (which was filed May 3, 2024) next asserts that the cardiologist changed plaintiff's weekly diabetic check to a daily check.  Id. The cardiologist also added a weekly weight check.  Id.

Plaintiff's A1C level[1] reached 9.6–9.7 upon his release from the hospital following his heart attack (which occurred on August 8, 2022) and "was 5.1 the last time it was checked." Id.

The amended complaint then notes that on June 28, 2023, Plaintiff was seen by a Dr. Thacker, a Wexford doctor who is not named as a defendant in this case. Id. Dr. Thacker "observed that [plaintiff] was not receiving his Lasix PRN . . . [and] prescribed the Lasix PRN . . . ." Id. Dr. Thacker also prescribed "Naproxen PRN" and two inhalers with KOP designations. Id. During the appointment, the nurse present informed Dr. Thacker that plaintiff was not allowed medication with a KOP designation. Id. After a reprimand by Dr. Thacker, the nurse "gave [plaintiff] a (30) day blister card[2] of each of the ingestible medications . . . ." Id. Plaintiff attempted to renew the medications after the blister cards ran out, but "was told that [May] would not allow them KOP, which prevented [plaintiff] from taking them as proscribed [sic]." Id. at 8. One of the prescribed inhalers "was taken by agents of

---

[1]  The court notes that "A1C level" likely refers to the result yielded by an A1C test, which measures to some extent the amount of glucose present in a respective patient's blood, expressed as a percentage.
[2]  The court notes that "blister card" likely refers to a limited supply of packaged medication indicating a related prescription's KOP designation.

[d]efendant Ames and [d]efendant Givens" on September 22, 2023. Id. at 7.

The amended complaint concludes summarily by stating that May "has discontinued the KOP[s] on at least four separate occasions[] spanning two years" and that "all [defendants] . . . are acting in concert to deprive [plaintiff] of his rights." Id. at 8.

### III. Governing Standards

#### a. PF&R Standard of Review

The court need not review, under a de novo or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the findings and recommendations to which no objection has been made. See Thomas v. Arn, 474 U.S. 140 (1985). Failure to timely file objections constitutes a waiver of de novo review and the plaintiff's right to appeal the order of the court. See 28 U.S.C. § 636(b)(1); see also United States v. Leon-Ramirez, 925 F.3d 177, 181 (4th Cir. 2019) (parties typically may not "appeal a magistrate judge's findings that were not objected to below, as [28 U.S.C.] § 636(b) doesn't require de novo review absent objection"); Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989).

Upon an objection to the PF&R, the court reviews de novo only "those portions of the report . . . to which objection is made."  28 U.S.C. § 636(b)(1); see also Howard's Yellow Cabs, Inc. v. United States, 987 F. Supp. 469, 474 (W.D.N.C. 1997) (citing Opriano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982)) ("De novo review is not required or necessary when a party makes general or conclusory objections that do not direct the court to a specific error in the magistrate judge's [PF&R].");  United States v. Midgette, 478 F.3d 616, 622 (4th Cir. 2007).  "Absent a specific and timely filed objection, the court reviews only for 'clear error,' and need not give any explanation for adopting the [PF&R]."  United States v. Hernandez-Aguilar, 359 F. Supp. 3d 331, 334 (E.D.N.C. 2019) (citing Camby v. Davis, 718 F.2d 198, 200 (4th Cir. 1983)).

### b.  Leave to Amend

Rule 15(a) of the Federal Rules of Civil Procedure instructs that "[t]he court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Such leave "should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile."  Franks v. Ross, 313 F.3d 184, 193 (4th Cir. 2002) (emphasis in original)

22

(quoting Edwards v. City of Goldsboro, 178 F.3d 231, 242 (4th Cir. 1999)).

An amendment is futile where "the proposed amended complaint fails to state a claim," Van Leer v. Deutsche Bank Sec., Inc., 479 F. Appx. 475, 479 (4th Cir. 2012), or when the amendment otherwise "fails to satisfy the requirements of the federal rules." United States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 376 (4th Cir. 2008). Thus, if the proposed complaint could not withstand a motion to dismiss under Rule 12(b)(6), the amendment is futile. Perkins v. United States, 55 F.3d 910, 917 (4th Cir. 1995).

### c. Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must recite "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); see also Monroe v. City of Charlottesville, 579 F.3d 380, 386 (4th Cir. 2009) (quoting Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008)). The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

"In assessing the sufficiency of a complaint, [the court] assume[s] as true all its well-pleaded facts." Nanni v.

23

Aberdeen Marketplace, Inc., 878 F.3d 447, 452 (4th Cir. 2017)
(citation omitted).  Well-pleaded facts are distinguished from
"conclusory statements" and "legal conclusions[,]" which are not
entitled to the same presumption of truth.  Beck v. McDonald,
848 F.3d 262, 270 (4th Cir. 2017) (citing Ashcroft v. Iqbal, 556
U.S. 662 (2009)).  Also, the court must "draw all reasonable
inferences in favor of the plaintiff."  Nanni, 878 F.3d at 452.
Ultimately, "the allegations must contain sufficient factual
heft to allow a court, drawing on judicial experience and common
sense, to infer more than the mere possibility of that which is
alleged."  Id. (internal quotations and citations omitted).

### IV.  Analysis

#### a. Plaintiff's Objections

Plaintiff asserts seven distinct objections to
Magistrate Judge Tinsley's PF&R.  See ECF No. 63.  Plaintiff's
first three objections, as more fully set forth next below, are
overruled as meritless exercises in semantics.

In his first objection, plaintiff attempts to construe
Magistrate Judge Tinsley's words -- that "[he] will now review
the sufficiency of [the amended complaint]" -- as proof that
leave to file the amended complaint was granted under Rule
15(a)(2).  Id. at 1.  Inasmuch as the entirety of the PF&R

24

analyzes whether that leave is so granted, the objection is meritless.

Plaintiff's second objection takes issue with Magistrate Judge Tinsley assuming correctional officers were present during the events surrounding plaintiff's heart attack despite the amended complaint's use of the term "EMTs," stating "To presume that Plaintiff was in the presence of officers should go without saying since he was facing transportation." Id. at 2. Plaintiff's third objection is that Magistrate Judge Tinsley's use of the term "individual alteration" in regard to plaintiff's refrained request to change the pill line timing of his medications is "prejudicial." Id.

Plaintiff's first three objections are not responsive to or effective against any of Magistrate Judge Tinsley's respective legal analyses of plaintiff's constitutional claims against defendants. They are mere exercises in semantics, and as such, they are overruled.

Additionally, plaintiff's seventh and final objection is a conclusory request that the undersigned judge reject the PF&R. Id. at 7–8. Inasmuch as the undersigned judge adopts the PF&R to the extent set forth below, the objection is overruled.

1.   Plaintiff's Fourth Objection

        Plaintiff objects to Magistrate Judge Tinsley's
finding that the proposed amended complaint's allegations, taken
as true, are insufficient to establish a claim for deliberate
indifference in violation of the Eighth Amendment against
defendant Ames.  See ECF No. 63 at 3–4.  Specifically, plaintiff
asserts that (1) Ames was in charge of the transportation
officers who were present with plaintiff during his cardiac
event, (2) Ames was "in charge of the state agency of which
Wexford has oversight," and (3) Ames "was put on notice that
Wexford was not honoring its contractual obligations" and that
"[s]urely defendant Ames is responsible . . . ."  Id. at 4.
Plaintiff cites Ames' alleged violation of MOCC Operational
Procedure 409(I)(A) which provides:

> The Superintendent shall designate specific members of
> the Executive Staff to serve as Liaison and exercise
> responsibility and authority with all contractors or
> sub-contractors involved in the provision of medical,
> dental, and mental health services.  Responsibilities
> of the Liaison include establishing formal and
> informal processes which ensure medical, dental, and
> mental health services are provided in accordance with
> policy, procedure, and contractual agreements . . . .

ECF No. 47-1 at 3.  Plaintiff argues that Ames' denial of
plaintiff's May 9, 2022, grievance, in which plaintiff
complained of May taking away his prescriptions' KOP
designations, violated this policy.  ECF No. 63 at 4.

26

Plaintiff's primary assertion against Ames is that he is responsible for the alleged actions of his subordinates and the medical personnel of contractor Wexford.  This is a legal fallacy, as "vicarious liability is inapplicable to Bivens and § 1983 suits . . . ."  Younger v. Crowder, 79 F.4th 373, 387 n.12 (4th Cir. 2023) (quoting Iqbal, 556 U.S. at 676).  "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Id.

Historically, the Fourth Circuit has employed a three-factor test to establish supervisory liability.  See, e.g., Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994); id. at 387 n.16.  That test asks:

> (1) whether the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury; (2) whether the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) whether there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Id. (internal citations and quotations omitted).  The Fourth Circuit in Younger recently expressed doubt that the three-part inquiry was entirely consistent with the Supreme Court's language in Iqbal, stating, "Rather than walk through this three-factor gloss here, we ask the simpler question -- and the

27

one more in line with the Supreme Court's statement that supervisors can only be liable for their own misconduct in § 1983 suits -- of whether [the supervisor] himself was deliberately indifferent." Id. (internal citations omitted).

The standard for deliberate indifference in this context is an "exacting" one, consisting of an objective and subjective component. Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014). "Objectively, the inmate's medical condition must be 'serious' -- 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Id. (quoting Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008)). Subjectively, the official must "'know[] of and disregard[] an excessive risk to inmate health or safety.'" Id. (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." Id. (emphasis in original).

At best, it is alleged in the proposed amended complaint that Ames denied plaintiff's May 9, 2022, grievance which stated, "Refer me to a [d]octor for health ca[re] and

prevent Sandra May from harassing me, by taking aw[ay] my
KOP[s]. Have my breathing problem addressed." ECF No. 1-1 at
1; see ECF No. 47.

First, it is dubious whether Ames' denial of
plaintiff's May 9, 2022, grievance amounted to a violation of
the institutional policy cited by plaintiff, but that
determination is of no moment here. A violation of
institutional policy alone does not establish a deliberate
indifference claim. Short v. Hartman, 87 F.4th 593, 613 (4th
Cir. 2023), cert. denied, 144 S. Ct. 2631, 219 L. Ed. 2d 1269
(2024). Plaintiff must allege facts, which taken as true,
establish a claim for deliberate indifference in accordance with
the precedent set forth above.

At best, plaintiff's single grievance put Ames on
notice of a disagreement between medical provider May and
patient plaintiff regarding appropriate treatment of plaintiff's
medical conditions. The disagreement involved the form in which
plaintiff received his medications (pill line versus KOP) and
inadequate treatment of an unspecified "breathing problem."
Even ignoring the objective component of deliberate
indifference, this is nowhere near the "actual subjective
knowledge" required to establish the subjective component.
Thus, plaintiff fails to plead an Eighth Amendment claim for

29

deliberate indifference against Ames, and his objection thereto
is overruled.

    2.   Plaintiff's Fifth Objection

        Plaintiff's fifth objection reiterates Ames alleged
liability, which has been adequately analyzed above, and newly
implicates Givens.  ECF No. 63 at 4–6.  Thus, plaintiff's fifth
objection is liberally construed as an objection to Magistrate
Judge Tinsley's finding that the proposed amended complaint's
allegations, taken as true, are insufficient to establish a
claim for deliberate indifference in violation of the Eighth
Amendment against Givens.

        Plaintiff specifically asserts that Givens, in her
supervisory role, should be liable for May's alleged actions,
which again, is a legal fallacy in this context.  <u>Id.</u> at 5.
Plaintiff cites Given's denial of his May 9, 2022, grievance.
<u>Id.</u>  He states that in denying his grievance, May violated
Wexford Operational Procedure 409(V)(B), which provides that:

> If an inmate requests specific health care treatment
> from an outside healthcare provider and declines the
> same service that is available from the contracted
> healthcare provider, the contracted healthcare
> provider will contact the outside healthcare provider
> and schedule an appointment for the inmate.

ECF No. 47-1 at 11; <u>id.</u> at 6.  Plaintiff also avers generally
that Givens violated "Operational Procedure #4.42" and

30

"Wexford's Keep on Person Medication Orientation," which allegedly "only permits a removal of more than six months for multiple violations of the KOP policy."  Id.

        In addition to the deliberate indifference precedent discussed in the above section, the court notes that "mere '[d]isagreements between an inmate and a physician over the inmate's proper medical care' are not actionable absent exceptional circumstances." Scinto v. Stansberry, 841 F.3d 219, 225–26 (4th Cir. 2016) (quoting Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985)).  The court also reiterates the standard's exactingness, such that "many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." Jackson, 775 F.3d at 178.

        The proposed amended complaint alleges that Givens (1) denied his May 9, 2022, grievance and (2) denied his request for "a different provider or a referral for outside treatment" at an in-person meeting.  See ECF No. 47.  Again, even ignoring the objective component of deliberate indifference, these facts do not establish the level of knowledge the subjective component requires.  At most, they allege a disagreement between Givens and plaintiff over what constituted proper medical care.  Thus, plaintiff fails to plead an Eighth Amendment claim for

31

deliberate indifference against Givens, and his objection thereto is overruled.

### 3.    Plaintiff's Sixth Objection

In plaintiff's last substantive objection, he resists Magistrate Judge Tinsley's finding that plaintiff's proposed amended complaint does not establish a policy or custom attributable to Wexford which would subject the entity to § 1983 liability.  ECF No. 63 at 6-7.  Because plaintiff does this primarily by arguing May's alleged conduct as an "employee" of Wexford constituted multiple violations of "Operational Procedure #4.42" and "Wexford's Keep on Person Medication Orientation," id., his objection is also generously construed as one to Magistrate Judge Tinsley's finding that the proposed amended complaint does not establish a claim of deliberate indifference in violation of the Eighth Amendment against May. The court will take each in turn.

### A.

With respect to Wexford, plaintiff must allege more than isolated instances of misconduct relating to his own medical treatment to subject the entity to § 1983 liability. See, e.g., Howard v. City of Durham, 68 F.4th 934, 953 (4th Cir. 2023) ("[S]poradic or isolated violations of rights will not give rise to Monell liability . . . ."); see also Powell v.

Shopco Laurel Co., 678 F.2d 504, 506 (4th Cir. 1982) (extending
Monell liability to private corporations acting under the color
of law).  Plaintiff, simply, does not so allege.  His objection
thereto is overruled.

B.

With respect to May, plaintiff reiterates that
"[w]hile [May's] first violation of the KOP policy took place
prior to filing his grievance, there have been many since that
time . . . ."  ECF No. 63 at 7.  Plaintiff further reiterates
his allegations relating to defendant May's morning scheduling
of his labs and May's conduct during his cardiac event.  Id.

The allegations against May in the amended complaint
amount to: (1) "at least four separate occasions" of
discontinuing the KOP designations of particular prescriptions,
requiring plaintiff to instead receive those prescriptions at
the pill line; (2) various denials of plaintiff's request to
change non-KOP prescriptions from morning pill line; (3) a
failure to treat plaintiff's breathing issues in the way
plaintiff desired; and (4) having an indirect influence on
plaintiff's being held "for a considerable amount of time" in
the MOCC medical unit during his August 2022 cardiac event.

The first three of these allegations amount merely to
treatment disagreements between patient plaintiff and provider

33

May of the kind explicitly precluded from § 1983 liability. Indeed, a reading of the proposed amended complaint in the light most favorable to plaintiff alleges, at bottom, that he did not have unfettered access to his desired prescriptions in their desired forms -- a right not contemplated by the Eighth Amendment.

As to the fourth allegation, May was newly implicated in the proposed amended complaint during the events of plaintiff's cardiac event when plaintiff was held in MOCC's medical unit and "told that [May] was coming to administer an EKG." ECF No. 47 at 5. This allegation does not fairly give rise to a claim of deliberate indifference against May following plaintiff's cardiac event, as it does not allege facts that, when taken as true, establish May had "actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction[,]" Jackson, 775 F.3d at 178, which the subjective prong demands.

That plaintiff was told May "was coming to administer an EKG" speaks little to May's knowledge of the severity or length of plaintiff's symptoms or May's knowledge of plaintiff's being held in medical for any "considerable" length of time. It is also not alleged that any action -- obstruction or otherwise -- was taken by May in regard to plaintiff's ultimate transport

to the hospital.  Even liberally construed and taken as true, the allegation asserts that May made some form of contact, once, with a correctional officer on the scene at some point during plaintiff's cardiac event and that she planned to perform an EKG test at some time.  This is not enough.

Thus, plaintiff does not state a claim against May for deliberate indifference, and plaintiff's objection thereto is overruled.

b.  Plaintiff's First Amendment Retaliation Claim

Magistrate Judge Tinsley found that the proposed amended complaint sufficiently asserts a First Amendment retaliation claim against May.  ECF No. 58 at 25.  The undersigned judge previously held that plaintiff's original complaint "failed to plead a causal relationship between his grievance and any allegedly retaliatory action by May[,]" ECF No. 46 at 30, and the proposed amended complaint does nothing to rectify the deficiency.

To state a claim for First Amendment retaliation, plaintiff must "show that (1) his speech was protected, (2) the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech, and (3) a causal relationship exists between [the plaintiff's] speech and the defendant's retaliatory action." Hodges v. Meletis, 109 F.4th

252, 262 (4th Cir. 2024) (alteration in original) (quotations omitted).

With regard to the causation element, Magistrate Judge Tinsley states that, "after receiving a KOP supply of his blood pressure medication on May 17, 2022, [p]laintiff alleges that May then repeatedly disallowed such privileges close in time to the filing of his grievance and the lawsuit, which could demonstrate a casual relationship between his protected conduct and the adverse action." ECF No. 58 at 25.  The analysis does not stop there.

Indeed, "temporal proximity alone can create the inference of causation." Hodges v. Meletis, 109 F.4th 252, 262 (4th Cir. 2024).  Critically, "the temporal proximity must be very close." Penley v. McDowell Cnty. Bd. of Educ., 876 F.3d 646, 656 (4th Cir. 2017).

Plaintiff filed his grievance on May 9, 2022.  The next time he went to pick up his medications, on May 17, 2022, they were all designated KOP.  ECF No. 47 at 5.  The amended complaint then states: "[W]hen those cards expired, [plaintiff] was told that only [d]efendant May could renew them . . . forc[ing] [plaintiff], yet again, to go without his blood pressure medications . . . ." Id.  Notably, it is not alleged that plaintiff attempted to renew the medications or that May

36

refused to renew the medications.  The fairest implication of
the allegation as it is set forth is that, at this point: May
<u>may</u> <u>have</u> required plaintiff to take some combination of his
medications at the pill line had he sought renewal.  <u>Id.</u>

Plaintiff filed his original complaint in this case on
July 11, 2022, and his proposed amended complaint, filed May 3,
2024, adds facts occurring after the filing.  While it is
decidedly impossible to discern the exact time and nature of
May's next alleged, direct denial of KOP designations, it is
sometime between plaintiff's cardiac event on August 8, 2022,
and his June 28, 2023, appointment with Dr. Thacker.  <u>See</u> <u>id.</u>
That means it would have occurred about three months to a year
after plaintiff filed his initial grievance, and about a month
to a year after plaintiff filed his original complaint in this
case.  These allegations of temporal proximity, as "the only
allegations in the complaint that go to causation . . . alone
are insufficient to plausibly allege causation."  <u>Hodges</u>, 109
F.4th at 263.

These circumstances are aligned with those at issue in
<u>Hodges</u>, in which the Fourth Circuit affirmed the dismissal of
the plaintiff's First Amendment retaliation claim because the
related allegations were not enough to satisfy the causation
element.  <u>See</u> <u>id.</u> (affirming dismissal where (1) the alleged

37

retaliatory action had occurred once before the plaintiff's grievance filing, (2) the alleged retaliatory action next occurred three-and-a-half-months after the plaintiff's grievance filing, and (3) the alleged acrimonious relationship between the plaintiff and the defendant "may [have] prove[d] the opposite" of the causation element).

Here, as in Hodges, it is alleged that various prescriptions of plaintiff were denied KOP status and given pill line designations before plaintiff engaged in any protected activity.  See ECF No. 47.  At least once before plaintiff filed his grievance, May required plaintiff to pick up a newly prescribed beta blocker at the pill line for a month before the medication was allowed KOP as a matter of course.  Id. at 2.  On another occasion, it is alleged that a pill line designation was given to plaintiff's blood thinner prescription because, as the undersigned judge previously articulated: "[May] felt that plaintiff 'would die from blood clots' without it, and he was not properly taking such medication when it was KOP."  ECF No. 46 at 29; id. at 3.  MOCC's internal KOP policy, which plaintiff refers to in his objections, accounts for a like situation stating that an inmate may be "expelled from the self-medication [KOP] program" where that inmate "uses [a] medication other than as ordered."  ECF No. 41-1 at 3.  As mentioned above, any alleged denial of KOP designations occurring after plaintiff's

grievance filing is temporally (and substantively) difficult to pinpoint but, like Hodges, is decidedly far removed in time from any of plaintiff's protected activity.  See ECF No. 47.

Magistrate Judge Tinsley further states that "May has not offered a non-retaliatory motive or legitimate penological explanation for her conduct to which this Court may defer . . . ."  ECF No. 58 at 25.  Magistrate Judge Tinsley's reliance on this point stems from "Martin II," in which the Fourth Circuit opined that "[o]nce a plaintiff establishes his protected conduct was a substantial or motivating factor in the defendant's decision to take adverse action, the defendant is appropriately tasked with explaining why her decision was not animated by retaliatory motives."  Martin v. Duffy, 977 F.3d 294, 301 (4th Cir. 2020) ("Martin II").  Indeed, "[a]fter an employee establishes a prima facie case of retaliation, the same-decision test allows an employer to defeat the claim by proving it would have reached the same decision . . . in the absence of the protected conduct."  Martin II, 977 F.3d at 299 (quotations omitted).

Martin II is readily distinguishable from this case, as it contemplates a First Amendment retaliation claim at the summary judgment stage.  See id.  The question here is not what happens after plaintiff has "establishe[d] a prima facie case of

retaliation," but whether he has even alleged such a case.  The court holds, for the reasons stated herein, that he has not, and Magistrate Judge Tinsley's finding and recommendation with respect thereto is not adopted.

**V.   <u>Conclusion</u>**

Accordingly, it is ORDERED that:

(1)  Plaintiff's objections (ECF No. 63) be, and hereby are OVERRULED;

(2)  The findings and recommendation in the Magistrate Judge's Proposed Findings and Recommendation (ECF No. 58) be, and hereby are, ADOPTED by the court and incorporated herein except as to the retaliation claim against defendant May which is hereby DISMISSED;

(3)  Plaintiff's Proposed Amended Complaint (ECF No. 47) is DISMISSED, and to the extent it is construed as a motion to amend, DENIED.

(4)  This action be, and hereby is, DISMISSED from the docket of the court.

The Clerk is directed to transmit copies of this order to all counsel of record, any unrepresented parties, and the United States Magistrate Judge.

ENTER:  December 1, 2025

John T. Copenhaver, Jr.
Senior United States District Judge